# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

PPR NOTE CO., LLC

        Plaintiff,

        v.

L2L INVESTMENTS, LLC d/b/a GSP REI and
PETER NEILL

        Defendants.

: CIVIL ACTION
:
: No.   20   799
:
: Jury Trial Demanded
:
:
:

FILED

FEB 12 2020

KATE BARKMAN, Clerk
By_____ Dep. Clerk

## VERIFIED COMPLAINT

Plaintiff, PPR Note Co., LLC ("PPR Note"), by and through its undersigned counsel, hereby files this Verified Complaint against Defendants L2L Investments d/b/a GSP REI ("GSP") and Peter Neill ("Neill") (collectively, "Defendants"), seeking injunctive and other relief, and in support thereof avers as follows:

## INTRODUCTION

1. This is an action for injunctive relief, money damages, and attorneys' fees and costs stemming from Neill's misappropriation of PPR Note's trade secrets and confidential information and Neill and GSP's use of such misappropriated information on behalf of GSP.

## PARTIES

2. Plaintiff PPR Note is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 920 Cassatt Road, Suite 210, Berwyn, PA 19312.

3. Upon information and belief, Defendant GSP is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 211 W Lancaster Ave., Suite 300, Paoli, PA 19301.

4.     Peter Neill is an individual residing, upon information and belief, at 719 Elgin Road, Newton Square, PA 19073 and is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the claims for relief arising under the Defend Trade Secrets Act pursuant to 28 U.S.C. § 1331 and over the pendent state law claims pursuant to 28 U.S.C. § 1367.

6.     This Court has personal jurisdiction over Defendants because they are citizens of the Commonwealth of Pennsylvania.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the residence and principal place of business of Defendants are within this District and a substantial part of the events giving rise to PPR Note's claims occurred in this District.

## FACTUAL BACKGROUND

### PPR Note's Business and Trade Secrets

8.     PPR Note is a holding company that manages residential mortgage investment funds collateralized by real estate assets nationwide.  Essentially, PPR Note creates and manages funds that invest in notes backed by real estate.

9.     It is a leading player in the real estate note industry and has been operating within the mortgage advisory and fund management industry since 2007.

10.     These investments are marketed widely, but only available to accredited investors, generally high net worth individuals.

11.     PPR Note invests heavily in marketing through outlets such as BiggerPockets, the MidAtlantic Real Estate Investor Summit, and its bi-monthly Strategic Investor Alliance meetings.

-2-

12.     PPR Note, and in particular its President and CEO, David Van Horn, have spent countless hours and resources producing articles, posts, advice columns, podcasts, and other materials in order to attract potential investors.

13.     PPR Note's marketing activities described above have helped it develop an extensive database of contacts interested in investing in real estate notes.

14.     PPR Note's contact database is a key to its success.   At the time of Defendants' misappropriation, PPR Note's database of actual and potential investors contained approximately 24,000 entries.

15.     PPR Note's database of actual and potential investors is not generally known to others and derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the use of the information.

16.     Through years of investment, hard work, and experience, PPR Note has also developed confidential and proprietary means of marketing and establishing note funds. Such information is PPR Note's trade secrets and/or confidential business information.

17.     PPR Note's proprietary means of marketing and establishing note funds are not generally known to others and derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the use of the information.

18.     PPR Note takes reasonable steps to protect its trade secrets and confidential information.

19.     The database of potential and actual customers is password protected and only a limited number of people within the company are able to access it.

-3-

20.     Similarly, PPR Note protects its marketing strategies and fund formation information from general disclosure and limits access to this information within its company.

21.     PPR Note also protects its information through the use of confidentiality requirements.

22.     Every PPR employee must sign an acknowledgement that they received and read the employee handbook, including its provisions relating to confidentiality.

### Neill's Employment with PPR Note and Subsequent
### Misappropriation of Trade Secrets and Confidential Information

23.     Defendant Neill was hired by PPR Note in 2015.

24.     Soon after being hired, Neill began working in investor relations for PPR Note.

25.     In this role, Neill's responsibilities included communicating with actual and potential investors and educating those actual and potential investors on PPR Note's funds.

26.     Neill needed to use, and was granted access to, PPR Note's database of actual and potential investors in order to perform his job duties at PPR Note.

27.     Neill needed to use, and was granted access to, PPR Note's confidential and proprietary information concerning its marketing and establishing of note funds.

28.     At no time did PPR Note authorize Neill to use its trade secrets and confidential information for any purpose outside the scope of his employment.

29.     To the contrary, PPR Note's employee manual at the time Neill joined the company explicitly stated:

**Confidentiality and Confidential Information**

PPR-protected business information shared within PPR is the property of PPR and is not to be provided to any other person or organization not authorized to receive the information, except as permitted or required by law.  PPR-protected business information

-4-

is considered confidential and proprietary information and includes
but is not limited to information such as services, strategies, plans,
litigation, computer processes, manuals, material, business
processes, protected HIPAA and GINA information, trade secrets,
pending projects, systems, procedures, financial information, cost
data, pricing formula, access codes, computer passwords, etc., as
this information relates to PPR and its business partners, vendors,
and customers. Improper disclosure of such confidential and
proprietary information is prohibited and may lead to disciplinary
action, up to and including termination. Similarly, all employees
are prohibited from bringing, disclosing, or using any confidential
or proprietary information or trade secrets from any former
employers or any of our organization's competitors during the
course of their employment with PPR.

Employees, who as part of their jobs have access to confidential
information of other employees, are prohibited from disclosing
such information to any other person or organization not
authorized to receive the information, except as permitted or
required by law.

30.     Neill signed an acknowledgement that he read and would abide by the

employee manual, including this confidentiality requirement. Neill's signed acknowledgement is

attached hereto as Exhibit 1.

31.     In December 2018, Neill informed PPR Note that he intended to leave

PPR Note.

32.     On or about March 1, 2019, Neill signed a severance agreement with PPR

Note (the "Severance Agreement"). The Severance Agreement is attached hereto as Exhibit 2.

33.     In exchange for a payment of $10,000, a month of continued medical

coverage, and other benefits, Neill made certain releases and agreed to not disclose PPR Note's

trade secrets and to return all of PPR Note's property and information:

6. **Trade Secrets.**
a. Employee expressly acknowledges and agrees that he has been
given access to and become familiar with business methods, trade
secrets, and other proprietary information developed at Employer's
expense (the "Trade Secrets"), which are valuable, unique, and
essential to the overall continued success and business goodwill of

Employer and Affiliates. Employee expressly acknowledges and agrees that the Trade Secrets are proprietary and confidential and if any of the Trade Secrets were imparted to or became known by any persons, including Employee engaging in a business in any way competitive with that of the Employer and/or Affiliates, such would result in hardship, loss, irreparable injury and damage to Employer, the measurement of which would be difficult, if not impossible, to determine. Accordingly, Employee expressly agrees that Employer has a legitimate interest in protecting the Trade Secrets and its business from such hardship, loss, irreparable injury and damage.

b. Employee acknowledges that the Trade Secrets give Employee an advantage over their competitors, and that the same is not available to or known by Employer's competitors or the general public. Employee further acknowledges that Employer has devoted substantial time, money, and effort in the development of the Trade Secrets and in maintaining the proprietary and confidential nature thereof. Employee further acknowledges Employee's position with Employer was one of the highest trust and confidence by reason of Employee's knowledge of, access to, and contact with the Trade Secrets. Employee covenants that, for a period of two (2) years from the date hereof, he will not disclose, disseminate or distribute to another, nor induce any other person to disclose, disseminate or distribute, any Trade Secrets of Employer, directly or indirectly, either for Employee's own benefit or for the benefit of another, nor will Employee use or cause to be used any Trade Secrets in any way. Employee acknowledges and covenants that all Trade Secrets relating to the business of Employer shall remain the exclusive property of Employer, shall not be copied or otherwise reproduced in whole or in part, and shall not be removed from the premises of Employer under any circumstances whatsoever.

7. **Company Property**: Employee, upon execution hereof, shall return all books, records, notes, computer data, computers, office keys, electronic key cards, data fobs, correspondence, documents and written information of whatsoever nature to Employer. Employee does hereby covenant, warrant and represent that he has not retained any information or property whatsoever [in] nature relating to the business of Employer. Employee further covenants, warrants, and represents his acknowledgement that Employer and Affiliates are relying upon Employee's representations herein which representations are a material inducement for Employer to enter into this agreement.

34.     The Severance Agreement is a valid and binding contract.

35.     After leaving PPR Note, Neill joined Defendant GSP as the Vice President of Investor Relations.  Neill's job description from GSP's website is attached hereto as Exhibit 3.

36.     GSP is a recently-founded direct competitor of PPR Note.  GSP and PPR Note create and manage similar funds backed by residential real estate and compete to raise capital from accredited investors interested in such funds.

37.     On or about November 5, 2019, PPR Note began receiving communications from its own investors that Neill was soliciting them on behalf of GSP.

38.     Numerous investors told Mr. Van Horn, either through email, telephone calls, or in person, that they had been contacted by Neill and solicited to invest in GSP.

39.     None of these investors told Mr. Van Horn that they had given their contact information to GSP or to Neill in his capacity as Vice President of Investor Relations for GSP.

40.     The investors that contacted PPR Note regarding Neill and GSP's solicitation are geographically diverse and come from a variety of locations across the nation.

41.     After learning of Neill's contact with its actual and potential investors, PPR Note began investigating how Neill was able to get the contact information of so many actual and potential investors for GSP when that business had only recently begun, particularly ones that were geographically diverse and did not appear to be connected in any other way other than their prior relationship with PPR Note.

42.     During its investigation, PPR Note learned that in the weeks leading up to this departure, Neill began regularly downloading and saving information from PPR Note's database of actual and potential investors including the names and email addresses of all 24,000 contacts that PPR Note had spent over a decade compiling through extensive marketing efforts.

43.     PPR Note also learned during its investigation that immediately after downloading PPR Note's trade secrets and confidential information, Neill would then access his personal gmail account from his work computer.

44.     There is no legitimate business reason that Neill would have to download information from PPR Note's database of actual and potential investors.

45.     Upon information and belief, based on PPR Note's investigation into Neill's computer activity prior to his departure, his immediate and repeated contact with PPR Note's actual and potential investors upon leaving to work for a rival business, and the fact that GSP and Neill could not have built their own database so quickly with such a diverse set of potential investors when it took PPR Note over a decade and substantial investments of time and money, Neill misappropriated PPR Note's database of actual and potential investors and is currently using it for the economic benefit of his new employer, GSP.

46.     Upon information and belief, Neill misappropriated other trade secrets and confidential information from PPR Note including marketing materials and information on how PPR Note establishes its funds, and is currently using that information for the economic benefit of his new employer, GSP.

47.     Upon information and belief, based on PPR Note's own communications with Neill and others at GSP, GSP is aware that Neill has misappropriated PPR Note's database of actual and potential investors as well as other trade secrets and confidential information and continues to use it for its own economic benefit.

## COUNT I
### PPR NOTE v. ALL DEFENDANTS
### (VIOLATION OF DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836, *ET SEQ.*)

48.     PPR Note incorporates the preceding paragraphs by reference as if fully set forth herein.

49.     As discussed above, PPR Note's trade secrets include, but are not limited to, PPR Note's database of actual and potential investors and the methods it uses to market and establish note funds.

50.     PPR Note's trade secrets are used in interstate commerce.

51.     PPR Note's trade secrets are of value to Neill and GSP who are competitors of PPR Note.

52.     PPR Note reasonably protected its trade secrets from disclosure through appropriate means such as password protecting its database, limiting access to certain employees, and requiring employees to agree to the confidentiality provisions in the employee handbook.

53.     Neill and GSP were aware that PPR Note's trade secrets were not disclosed to others and that these trade secrets are critical to PPR Note's success.

54.     Neill and GSP misappropriated PPR Note's trade secrets by Neill secretly downloading information and sending it through his personal gmail account in the weeks before his departure from PPR Note.

55.     Upon information and belief, PPR Note's trade secrets have been transferred to and maintained on GSP's computers.

56.     Neill and GSP have been actively using PPR Note's trade secrets as evidenced by their communications to individuals in PPR Note's database of actual and potential customers.

57.     GSP clearly knew such information was misappropriated from PPR Note because it is a newly formed entity and could not have built such as substantial database of geographically diverse contacts by itself in such a short period of time.

58.     PPR Note has suffered, and continues to suffer, irreparable harm by Neill and GSP's continued use of PPR Note's misappropriated trade secrets.

59.     PPR Note has also suffered monetary damage from Neill and GSP's misappropriation of its trade secrets. PPR Note has been damaged by GSP and Neill contacting their actual and potential investors through the loss of goodwill, loss of business opportunities, and other continuing harm.

60.     Neill and GSP have been unjustly enriched by their use of PPR Note's misappropriated trade secrets.

61.     GSP and Neill have acted willfully, maliciously, and with reckless disregard for the rights of PPR Note, entitling PPR Note to the recovery of double damages and reasonable attorneys' fees.

### COUNT II
### PPR NOTE v. ALL DEFENDANTS
### (VIOLATION OF PENNSYLVANIA UNIFORM TRADE
### SECRETS ACT 12 P.S. § 5301, ET SEQ.)

62.     PPR Note incorporates the preceding paragraphs by reference as if fully set forth herein.

63.     As discussed above, PPR Note's trade secrets include, but are not limited to, PPR Note's database of actual and potential investors and the methods it uses to market and establish note funds.

64.     PPR Note's trade secrets are of value to Neill and GSP who are competitors of PPR Note.

65.     PPR Note reasonably protected its trade secrets from disclosure through appropriate means such as password protecting its database, limiting access to certain employees, and requiring employees to agree to the confidentiality provisions in the employee handbook.

66.     Neill and GSP were aware that PPR Note's trade secrets were not disclosed to others and that these trade secrets are critical to PPR Note's success.

67.     Neill and GSP misappropriated PPR Note's trade secrets by Neill secretly downloading information and sending it through his personal gmail account in the weeks before his departure from PPR Note.

68.     Upon information and belief, PPR Note's trade secrets have been transferred to and maintained on GSP's computers.

69.     Neill and GSP have actively been using PPR Note's trade secrets as evidenced by their communications to individuals in PPR Note's database of actual and potential customers.

70.     GSP clearly knew such information was misappropriated from PPR Note because it is a newly formed entity and could not possibly have built such as substantial database of geographically diverse contacts by itself in such a short period of time.

71.     PPR Note has suffered, and continues to suffer, irreparable harm by Neill and GSP's continued use of PPR Note's misappropriated trade secrets.

72.     PPR Note has also suffered monetary damage from Neill and GSP's misappropriation of its trade secrets. PPR Note has been damaged by GSP and Neill contacting their actual and potential investors through the loss of goodwill, loss of business opportunities, and other continuing harm.

73.     Neill and GSP have been unjustly enriched by their use of PPR Note's misappropriated trade secrets.

74.     GSP and Neill have acted willfully, maliciously, and with reckless disregard for the rights of PPR Note, entitling PPR Note to the recovery of double damages and reasonable attorneys' fees.

## COUNT III
### PPR NOTE v. ALL DEFENDANTS
### (IMPROPER PROCUREMENT OF CONFIDENTIAL INFORMATION)

75.     PPR Note incorporates the preceding paragraphs by reference as if fully set forth herein.

76.     As discussed above, in addition to the information constituting PPR Note's trade secrets, upon information and belief, Neill has also misappropriated confidential business information relating to the methods PPR Note uses to market and establish note funds.

77.     Upon information and belief, Neill and GSP have used and will continue to use PPR Note's confidential information to advance their rival business interests by expropriating PPR Note's investment and innovation in creating its marketing and fund formation materials.

78.     Neill and GSP's misappropriation and misuse of PPR Note's confidential information has harmed, and unless enjoined by this Court, will continue to harm PPR Note.

79.     PPR Note has also suffered monetary damages from Neill and GSP's misappropriation of its confidential information including through the loss of goodwill and the loss of business opportunities.

80.     Neill and GSP have been unjustly enriched by their use of PPR Note's misappropriated confidential information.

81.     GSP and Neill have acted willfully, maliciously, and with reckless disregard for the rights of PPR Note, entitling PPR Note to punitive damages.

## COUNT IV
### PPR NOTE v. ALL DEFENDANTS
### (UNFAIR COMPETITION)

82.     PPR Note incorporates the preceding paragraphs by reference as if fully set forth herein.

83.     The wrongful conduct of Defendants, as discussed above, constitutes unfair methods of competition and/or unfair and deceptive acts and practices in violation of PPR Note's rights.

84.     As a direct and proximate cause of Defendants' wrongful conduct, PPR Note has suffered financial losses, imminent and permanent irreparable harm, loss of confidentiality of their trade secrets and confidential information, loss of goodwill, loss of business opportunities, and other continually accruing damages.

## COUNT V
### PPR NOTE v. NEILL
### (BREACH OF CONTRACT)

85.     PPR Note incorporates the preceding paragraphs by reference as if fully set forth herein.

86.     As discussed above, PPR Note and Neill entered into the Severance Agreement, a valid and binding contract whereby, among other consideration and provisions, Neill received $10,000 in exchange for agreeing not to disclose PPR Note's trade secrets and for returning all company property, including electronic documents and data. *See* Ex. 2, Severance Agreement.

87.     Neill violated the Severance Agreement by misappropriating PPR Note's trade secrets and confidential information, then using PPR Note's trade secrets and confidential information on behalf of himself and his new employer, GSP.

88.    As a direct and proximate cause of Neill's breach of the Severance Agreement, PPR Note has suffered financial losses, imminent and permanent irreparable harm, loss of confidentiality of their trade secrets and confidential information, loss of goodwill, the loss of business opportunities, and other continually accruing damages.

89.    Pursuant to the Severance Agreement, PPR Note is also entitled to the return of the $10,000 paid to Neill and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff PPR Note Co., LLC requests judgment in its favor against Defendants L2L Investments, LLC d/b/a GSP REI and Peter Neill and the following relief:

1.    That Defendants GSP and Neill, including their officers, agents, servants, employees, affiliates, licensees, assigns, and attorneys, be temporarily, preliminary, and thereafter permanently enjoined from:

(a)    Using, accessing, or maintaining any of PPR Note's trade secrets and/or confidential information including, but not limited to, PPR Note's database of actual and potential investors and PPR Note's methods for marketing and establishing note funds.

(b)    Continuing to contact any actual or potential investors whose contact information GSP and Neill unlawfully misappropriated from PPR Note.

(c)    Entering into any agreements with any actual or potential investors whose contact information GSP and Neill unlawfully misappropriated from PPR Note.

2. An Order directing Defendants GSP and Neill to turn over for forensic examination all computers and devices (including external media such as hard drives, flash drives, and CDs) for the purpose of allowing PPR Note to confirm the removal of all PPR Note trade secrets and confidential information.

3. An Order directing Defendants GSP and Neill to give PPR Note certain audit rights for the next five (5) years. During this time period, each time GSP and/or Neill are involved in raising money for a fund backed by notes on real estate, they shall provide a list of their investors to a neutral, third-party that shall compare that list against PPR Note's investors. To the extent any PPR Note investors also invest in a fund in which GSP or Neill is involved, GSP or Neill must demonstrate that their solicitation of that investor was based on a connection or contact other than PPR Note's trade secrets and confidential information. If GSP or Neill is unable to demonstrate an independent connection for the solicitation, they shall disgorge all profits associated with that investor to PPR Note.

4. An award of compensatory damages in the amount to be determined after the discovery of all relevant evidence and trial.

5. An award of all profits received by Neill and GSP based upon their use of PPR Note's trade secrets and/or confidential information.

6. An award of $10,000 based upon Neill's breach of the Severance Agreement.

7. An award of exemplary, punitive, and other monetary damages allowed by law and equity.

8.      The statutory doubling of damages pursuant to the Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act.

9.      Attorneys' fees and costs pursuant to the Defend Trade Secrets Act, the Pennsylvania Uniform Trade Secrets Act, and the Severance Agreement.

10.     Any other relief as this Court deems just, appropriate, and equitable.

### JURY TRIAL DEMAND

Plaintiff PPR Note Co., LLC demands a jury trial on each issue triable thereby.

Respectfully submitted,



Sean McDevitt (PA 71638)
Michael S. Hino (PA 62406)
Alexander L. Harris (PA 311382)
PEPPER HAMILTON LLP
400 Berwyn Park
899 Cassatt Road
Berwyn, PA 19312-1183
(610) 640-7800

Dated: February 12, 2020           *Attorneys for Plaintiff PPR Note Co., LLC*

FILED

FEB 1 2 2020

KATE BARKMAN, Clerk
By _____ Dep. Clerk

-16-

## VERIFICATION

I, David Van Horn, hereby state that I am the President and CEO of Plaintiff PPR Note Co., LLC; that I am authorized to make this verification on behalf of PPR Note Co., LLC; that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief; and that all statements herein are made subject to the penalties to 28 U.S.C. § 1746.

David Van Horn

Dated:  February 11, 2020

# EXHIBIT 1

EMPLOYEE MANUAL PPR NOTE CO., LLC

## Acknowledgment of Receipt Form
## For
## PPR Note Company Employee Manual

Please read the following, complete the bottom of the page, and return to the Director of Borrower Management of PPR Note Co., LLC (also referred to as "PPR").

**Understanding and Acknowledging Receipt of PPR Employee Manual**

I have received, via email or a printed copy, the Employee Manual for PPR. I understand that it is my obligation to read the Employee Manual and consistent with PPR's open-door approach to communication, I can, at any time, ask any questions or raise any concerns about its content with the Director of Borrower Management of PPR relative to my employment. I understand that as a requirement of my employment, I will adhere to the policies, provisions, and statements identified in the Employee Manual, as they may be modified from time to time. I also understand that:

- The policies, provisions, and statements in the Employee Manual are not all-inclusive and therefore are to be considered as guidelines.
- The entire Employee Manual is presented as a matter of information only, and that PPR, at its option, may take such actions which change, add to, delete, suspend, or discontinue any part or parts of the Employee Manual at any time without prior notice as client needs, funding, finances, employment legislation, organizational strategy, competitive pressures, economic conditions, operational or business needs, etc. dictate. Any such actions shall apply to existing as well as to future employees and shall be effective immediately, without notice thereof having been received by me.
- Employees shall not accrue eligibility for any benefits, rights, or privileges beyond the last day worked.
- No one other than the Director of Borrower Management of PPR may alter or modify any of the policies, provisions, or statements in the Employee Manual and any such alterations or modifications can only be made in writing.
- The Employee Manual does not create a contract, expressed or implied.
- If at any time I have access to or find confidential and personal information of other employees, clients, and/or vendors, that I will maintain the confidentiality of such information, that I will only use such information for its intended purpose, and that I will comply with the Sensitive Information & Identity Theft Policy contained herein as well as all federal and state laws that regulate the handling of such information which includes but is not limited to FACTA, HIPAA, GINA, the Privacy Act, Gramm/Leach/Bliley, ID Theft Laws (where applicable).
- No statement or promise by a supervisor, past or present, may be interpreted as a change in policy nor will it constitute an agreement with an employee.
- The currently dated Employee Manual supersedes any and all other or previous PPR' Employee Manuals, or other previous PPR' policies, provisions, statements, or guidelines whether written or oral.

**At-Will Employment**

I understand that any employment with PPR is at-will and that no current or past policy, procedure, or practice of PPR will be construed by me as altering this at-will relationship. I understand that neither PPR nor I have entered into a contract regarding the duration of my employment. I understand that nothing contained in this Employee Manual, as it is currently written or may be modified from time to time, will be interpreted by me as creating any right of continued employment or any contractual relationship with PPR. I understand that I am free to end my employment with PPR at any time, with or without reason. Likewise, PPR has the right to end my employment, or otherwise discipline, transfer, or demote me at any time, with or without reason, at the discretion of PPR. I understand that no employee of PPR can enter into an employment contract for a specified period of time, or make any agreement contrary to this at-will policy without the express written approval of the Director of Borrower Management of PPR.

Peter Neill
Printed Name

Signature

Marketing Assistant
Position

2/6/15
Date

3/1/14

# EXHIBIT 2

### `SEVERANCE AGREEMENT

**THIS SEVERANCE AGREEMENT** (this "Agreement") dated this 1st day of March 2019 is by Peter Neill a Pennsylvania resident ("Employee") in favor of PPR Note Co LLC ("Employer").

#### Explanatory Statement

Employee has been terminated from his employment with Employer. Employer and Employee desire to formalize their arrangements to sever the employment relationship and to fully and finally resolve any and all existing or potential issues and disputes relating to the employment relationship or the severance thereof.

**NOW, THEREFORE**, in consideration of the sum set forth in Paragraph 2 below and other good and valuable consideration, the adequacy of which is hereby acknowledged by Employee, Employee agrees as follows:

1. **Termination**. Effective as of March 1st, 2019, Employee is terminated from his employment with Employer and acknowledges that he will no longer be an employee of Employer.

2. **Final Payments.**

a.  **Severance**. Employer will pay to Employee Five Thousand Dollars ($5,000.00). This amount will be paid as Salary Continuation with a Severance Length of 4 weeks. Salary Continuation payments will be made in accordance with PPR Note Co LLC's normal pay schedule and applicable deductions will be made. Employee expressly agrees that this payment exceeds any and all existing compensation to which Employee is or might be entitled for all salary and benefits and that this payment is not a benefit to which Employee is already entitled. During the Salary Continuation Period, PPR Note Co LLC will provide medical insurance coverage to Employee under its current plans at the employee rate in effect. The Employee payment for this coverage will be deducted from the Salary Continuation Payments. Following the end of the Salary Continuation Period, Employee will be entitled to continuation of group health plan benefits to the extent authorized by and consistent with 29 U.S.C. § 1161 et seq. (commonly known as COBRA).

b.  **Unused PTO.** Employer will pay Employee for 160 accrued, unused PTO hours, in the amount of ($5,000.00). Payment for unused PTO will occur in the final pay of the severance period.

3. **Release of Employer**. Employee, for himself, and his heirs, executors, administrators, personal representatives, successors and assigns, does hereby irrevocably release and forever discharge Employer, including but not limited to PPR Note Co LLC, as well as any of Employer's subsidiaries, successors, purchasers, assigns, stockholders, officers, agents, members, attorneys and employees ("Released Parties"), of and from all and every manner of action and actions, cause and causes of action, damages, demands, liabilities, suits, judgments, expenses and claims whatsoever, known or unknown, in law and/or equity, which Employee ever had, now has or hereafter can, shall or may have against Released Parties, for, upon, or by reason of any matter, act, occurrence, omission, transaction or cause or thing whatsoever, from the beginning of time to the date of this Agreement, including but not limited to, any claim or action, cause or causes of action, known or unknown, which Employee ever had, now has, or hereafter can, shall or may have against Released Parties, arising out of, as a consequence of, or by reason of, resulting from, or connected in any way, with Employee's employment by Employer and/or Affiliates or the

1

Initial Here

termination of that employment. Employee acknowledges, understands, and expressly agrees that this Agreement is a general release.

Employee realizes there are many laws and regulations governing the employment relationship. These include, but are not limited to, Title VII of the Civil Rights Acts of 1964 and 1991; the Americans with Disabilities Act; the Age Discrimination and Employment Act; the National Labor Relations Act; 42 U.S.C. § 1981; the Family and Medical Leave Act; the Fair Labor Standards Act; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. (other than any accrued benefit(s) to which you have a non-forfeitable right under any pension benefit plan); other state, local, and federal employment laws; and any amendments to any of the foregoing. Employee also understands there may be other statutes and laws of contract and tort that also relate to his employment. By signing this Agreement, Employee waives and releases any rights Employee may have against the Released Parties under these and any other laws based on any act, omission, matter, cause or thing through the date of Employee's execution of this Agreement, to the fullest extent of the law. To the extent that Employee cannot waive any claim(s) under an applicable worker's compensation statute, this release is limited only to the extent necessary to comply with said law. Employee acknowledges and agrees that he is aware of no facts which might lead a reasonable person to believe that he has a worker's compensation claim against Employer. Employee also agrees not to initiate, pursue, join, or voluntarily participate in any administrative action or suit in any court, or to accept any damages or other relief from any such proceeding, brought by Employee or anyone else operating on behalf of Employee, based on any act, omission, matter, cause or thing through the date of Employee's execution of this Agreement.

**4. No Liability.** The Employee agrees that the above-mentioned consideration, and all other undertakings by the parties, are not to be construed as admissions of wrong doing or liability on the part of either party, but that on the contrary, any such wrong doing or liability is expressly denied by the parties.

**5. Non-Disclosure.** The Employee agrees to keep the terms of this Agreement in confidence and not to make unfavorable, derogatory or disparaging comments about any of the Released Parties, and that Employee will not provoke, foster, or encourage any acts of ill will against any of the Released Parties.

**6. Trade Secrets.**
a. Employee expressly acknowledges and agrees that he has been given access to and become familiar with business methods, trade secrets, and other proprietary information developed at Employer's expense (the "Trade Secrets"), which are valuable, unique, and essential to the overall continued success and business goodwill of Employer and Affiliates. Employee expressly acknowledges and agrees that the Trade Secrets are proprietary and confidential and if any of the Trade Secrets were imparted to or became known by any persons, including Employee engaging in a business in any way competitive with that of the Employer and/or Affiliates, such would result in hardship, loss, irreparable injury and damage to Employer, the measurement of which would be difficult, if not impossible, to determine. Accordingly, Employee expressly agrees that Employer has a legitimate interest in protecting the Trade Secrets and its business from such hardship, loss, irreparable injury and damage.

b. Employee acknowledges that the Trade Secrets give Employer an advantage over their competitors, and that the same is not available to or known by Employer's competitors or the general public. Employee further acknowledges that Employer has devoted substantial time,

2

Initial Here

money, and effort in the development of the Trade Secrets and in maintaining the proprietary and confidential nature thereof. Employee further acknowledges Employee's position with Employer was one of the highest trust and confidence by reason of Employee's knowledge of, access to, and contact with the Trade Secrets. Employee covenants that, for a period of two (2) years from the date hereof, he will not disclose, disseminate or distribute to another, nor induce any other person to disclose, disseminate or distribute, any Trade Secrets of Employer, directly or indirectly, either for Employee's own benefit or for the benefit of another, nor will Employee use or cause to be used any Trade Secrets in any way. Employee acknowledges and covenants that all Trade Secrets relating to the business of Employer shall remain the exclusive property of Employer, shall not be copied or otherwise reproduced in whole or in part, and shall not be removed from the premises of Employer under any circumstances whatsoever.

7. **Company Property**: Employee, upon execution hereof, shall return all books, records, notes, computer data, computers, office keys, electronic key cards, data fobs, correspondence, documents and written information of whatsoever nature to Employer. Employee does hereby covenant, warrant and represent that he has not retained any information or property whatsoever nature relating to the business of Employer. Employee further covenants, warrants, and represents his acknowledgement that Employer and Affiliates are relying upon Employee's representations herein which representations are a material inducement for Employer to enter into this agreement.

8. **Cooperation**: Employee agrees to reasonably cooperate with the Employer in the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of any of the Company, which relate to events or occurrences that transpired while you were employed by the Company. Employee's reasonable cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company. Employee also agree to reasonably cooperate with the Company in connection with any investigation or review of any federal, state, or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while Employee was employed by the Company. Employee understands that in any legal action, investigation, or review covered by this paragraph that the Company expects Employee to provide only accurate and truthful information or testimony.

9. **Entire Agreement**. The Employee agrees that this Agreement shall be binding upon and inure to the benefit of his personal representatives and assigns, that this Agreement comprises the entire understanding of the parties, that there are no additional promises or terms not contained herein, and that this Agreement shall not be modified except in writing signed by Employer and Employee.

10. **Governing Law**. The parties further agree that this Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Delaware.

11. **Severability**. If any terms of the above provisions of this Agreement are found null, void or inoperative for any reason, the remaining provisions will remain in full force and effect. The language of all parts of this Agreement shall, in all cases, be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

12. **Entire Agreement**: This Agreement contains the complete understanding between the parties regarding the subject matter herein and supersedes and replaces any prior agreements between Employer and the Employer, both written and oral, except for any agreement to arbitrate

3

Initial Here

disputes. This Agreement may only be changed in writing and when signed by both Employee and Employer.

13. **Breach by Employee**: In the event of a disclosure prohibited by this Agreement or if Employee breaches any commitment made in this Agreement, then, in addition to any other rights the Employer may have: (a) Employee agrees that no further payments under this Agreement shall be due and the Employer shall have the right to recover the payments to Employee set forth above, in paragraph 2, and (b) Employee shall pay the Employer's attorney's fees and other costs incurred by the Employer in connection with the breach or a threatened breach, including, but not limited to, seeking to recover such payments and/or to obtain injunctive relief with respect to the breach or any subsequent breach.

14. **No Reliance**. Employee represents that he has read this Agreement, that he understands all of its terms, that he has had the opportunity and sufficient time to fully discuss and disclose the terms of this Agreement with any attorney of his choice, that in executing this Agreement he does not rely and has not relied upon any representation or statements made by any one of Employer's agents, representatives, or attorneys with regard to the subject matter, basis or effect of this Agreement, and that he enters into this Agreement voluntarily, of his own free will and with knowledge of its meaning and effect.

15. **Reformation**. The parties hereto agree that if any court of competent jurisdiction shall determine that the period, or any other term or provision of this Agreement, is unreasonable, the said term, or provision shall not be deemed to be null and void but shall be reformed to impose the maximum enforceable period, term or other provision as the case may be.

16. **Voluntary Nature of Agreement and Effective Date**: Employee agrees and acknowledges that Employee has carefully read this Agreement; that Employee has had an opportunity to review this Agreement with an attorney; that Employee understand its final and binding effect; that the only promises made to Employee are those expressly set forth in this Agreement; and that Employee is signing this Agreement voluntarily and knowingly. Employee understands that he has four calendar days from the day he receives this Agreement to review and consider it. Once signed and returned, Employee may revoke the Agreement, only in writing, within seven (7) days of execution. To obtain the severance pay as described in paragraph 2 on the first page of the Agreement, Employee must sign, return and not revoke this Agreement. The Agreement will take effect only after it has been signed and returned and the revocation period has passed.

**IN WITNESS WHEREOF**, Employee has executed this Agreement as of the date first written above.

WITNESS:                                                    EMPLOYEE:

4

Initial Here

# EXHIBIT 3

2/11/2020                                    Who We Are | GSP REI

pneill@gsprei.com        **(215) 821-7030**





## PETER NEILL
### VICE PRESIDENT, INVESTOR RELATIONS | PARTNER

Peter Neill serves as Vice President of Investor Relations for the Company. He is
chiefly responsible for fulfilling the company's capital raising goals by communicating
and marketing the company's private offerings and maintaining key relationships with
the company's investors.

Mr. Neill began his real estate career working in marketing and sales at PPR Note Co.
This gave him the ability to learn all aspects of the distressed mortgage business. He

Who We Are | GSP REI

2/11/2020

pneill@gsprei.com          **(215) 821-7030**



business and had a firsthand look and active role in transitioning the company from mainly acquiring second position mortgages to acquiring both first and second position mortgages.

Mr. Neill purchased his first rental property a duplex, at the age of 24 utilizing an FHA loan. He is also the Founder of Accredited Life, a lifestyle community and personal/financial development brand for accredited investors, soon-to-be accredited investors and their families. He holds meetings in the Philadelphia area once a week and one-on-one sessions in-person and over the phone daily.

Mr. Neill graduated with a Bachelors of Arts from Temple University where he studied Media Business and Entrepreneurship. He is an avid dog lover, who looks forward to adopting his first GSP soon.